GUSTAVE A. R. HAMRE *vs.* MICHAEL ETZEL & SONS, INC., ET AL.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, JS.

Argued May 7th—decided June 6th, 1935.

*George E. Beers* and *William L. Beers,* for the appellant (plaintiff).

*John Elliott,* for the appellees (defendants).

HINMAN, J.   The First Ecclesiastical Society of Branford owns the fee in a tract of land in the town of Branford, comprising over two hundred acres, which it leased for ninety-nine years from March 1st, 1868, to John Legatt.   He assigned the lease to Samuel Beach, who, and, after his death, his heirs, subleased various portions of the tract.   In 1903 they sublet to Frederick L. Averill for the balance of the term, all the rest of the land, including the two lots involved in this action, reserving an annual rental of $2000.   The lease was defeasible for non-performance of covenants including payment of the annual rental and all taxes assessed on the premises.   Averill and his assigns subdivided the land into a large number of parcels and made conveyances to a large number of persons, in some instances by quitclaim deeds for lump sum considerations, sometimes purchase-money mortgages being taken back, and in others by subleases, reserving yearly rentals. The situation thereby created, especially with regard to taxation, is no stranger in this court.   *State ex rel. Foote* v. *Bartholomew,* 103 Conn. 607, 132 Atl. 30; 106 Conn. 698, 138 Atl. 787; 108 Conn. 246, 142 Atl. 800; 111 Conn. 427, 150 Atl. 308; *State* v. *Erickson,* 104 Conn. 542, 133 Atl. 683; 106 Conn. 698, 138 Atl. 787; 108 Conn. 246, 142 Atl. 800; *Montgomery* v. *Bran-*

*ford,* 107 Conn. 697, 142 Atl. 574; 109 Conn. 388, 147 Atl. 9; *Foote* v. *Branford,* 109 Conn. 358, 146 Atl. 723.

On October 24th, 1914, the plaintiff took an assignment of the Averill lease of a large tract of this land in consideration of $2600, which paid the rent to the end of the term—March 1st, 1967. He subdivided the tract into forty-four lots and expended considerable sums in developing them, including clearing the land and building roads. Two of these lots were leased separately to the named defendant for the remainder of the term, at a yearly rental of $25 each, and it entered into possession and paid the rent up to that due in the spring of 1930. The plaintiff retained five lots for himself and assigned the lease of all of the others to sundry parties, to the end of the term, for entire sums a portion of which was paid in cash and a portion in deferred payments, represented by notes secured by mortgages, which payments were intended to be in full of all rentals to March 1st, 1967.

Eventually Averill's interest in the various tracts was assigned to Ernest L. Averill, who agreed to assume and pay to the heirs of Beach the rentals provided for in the original transfers, amounting to $2375 yearly. He paid the rent until 1930 but failed to pay that becoming due in that year and in 1931, and on December 26th, 1931, the Beach heirs terminated the lease for breach of covenants to pay rent and taxes, brought summary process, and took judgment thereon on February 16th, 1932. There were then upward of one hundred and fifty sublessees of Frederick L. Averill and his assigns in actual possession of lots into which the tract had been subdivided, some paying an annual rent and some having paid for the whole term, who had built dwellings and made improvements on their lots. The termination of the Beach-Averill lease terminated all subleases and land interests under it.

Naturally these sublessees were greatly agitated and conferred as to steps to protect their dwellings and improvements and mitigate their losses. An existing voluntary association of sublessees called a meeting to which were invited all the former holders under the Averill leases. At this meeting, held on January 30th, 1932, a committee was raised to ascertain the facts and report back to a future meeting. This committee prepared a report and recommendations, copies of which were sent to practically everyone known to have an interest in any part of the land, including the plaintiff, with a call for a second meeting on February 13th, 1932.

The report of the committee mentioned three methods of procedure as possible: (1) Permit the summary process to proceed and each leaseholder negotiate a new lease with the Beach family; (2) accept an assignment of the Averill leases and pro rate the expenses among the leaseholders; or (3) permit the summary process to be consummated, make a new lease with the Beach heirs and new subleases with those present sublessees who wish to take them. As to (1) the recommendation was that it was inadvisable if a better plan could be found. Plan (2), it was pointed out, would involve taking "subject to all the incumbrances which may have accrued in the years the Averill leases have been in existence," and "in their present condition as to sublessees" and no more rental could be obtained than the subleases called for, while "the present income is not sufficient to balance the expense budget and new and enforceable income will have to be found." Therefore the committee recommended that "we let the 'dead past bury its dead' and make a new deal." As to (3), it was stated that the Beach heirs, after the completion of the forfeiture of the Averill leases, would give a new lease on the same

premises provided arrearages of rent were paid and they had assurance that the covenants would be performed, and the committee recommended proceeding under plan (3), organizing a corporation to take a new lease from the Beach heirs and giving a new lease to each of the present leaseholders who wished his lease renewed, each to subscribe for "substantially as many shares of stock as the assessed value of his present leased land . . . bears to the sum of all assessments," and any who were unwilling to so subscribe for stock or renew their lease for the balance of the term to "have the option of withdrawing from the plan and disposing of whatever property he may have." This recommendation was unanimously approved and the committee was continued to put it into effect.

Accordingly the committee caused a business corporation, the defendant The Branford Shore Realty Company, hereinafter called the company, to be organized with the immediate purpose of obtaining a lease of the Averill tracts from the Beach heirs and giving a "sublease to each of the occupants of the lot which it formerly occupied under the Beach-Averill lease." On March 14th, 1932, the corporation's counsel sent out subscription blanks with a letter stating that the incorporators had obtained a list of the assessments of all lots under the Averill lease and estimated the number of shares each sublessee would have to subscribe for and notifying each of the number of shares allotted to him. It was also stated therein that "only the stockholders in the new corporation will be given a new lease . . . as land not taken up by the old sublessees will be leased to others for full rental value. This co-operative movement is undertaken to get new leases at cost for the old sublessees." The subscription agreement contained a provision under which each signer agreed to take the number of shares allotted to

him "in substantially the proportion that the assessed value, on the list of 1931, of the premises occupied under the Averill lease bears to the sum of the assessed values on the list of 1931 of the other parties who shall subscribe for stock." The incorporators allotted twenty shares to the plaintiff, this number being based upon the assessed value of the five lots retained by him as above stated. He signed and delivered a subscription for these twenty shares and attended a meeting on March 21st, 1932, at which by-laws of the corporation were adopted and directors elected, he being elected a director.

At the first meeting of the directors, March 26th, 1932, a vote was passed "that in fixing annual rentals no discrimination should be made in favor of former holders of paid-up leases," but at a second meeting on April 23d that vote was rescinded and one passed "that the so-called paid-up leaseholders under the Averill leases pay one and three-fourths per cent. of the assessed value of their premises . . . and those who had formerly paid an annual rental should pay the same rental, except in cases where that did not amount to two and one-fourths per cent. of the assessed value, in which case they would pay two and one-fourths per cent. of the assessed value." The plaintiff actively participated in both these meetings. At the meeting of March 26th it was also voted to instruct counsel to notify all leaseholders who had not yet subscribed for the shares allotted them that they must do so before April 15th "in order to have the privilege of securing a new lease, and that all property not leased to the old occupants by that time will be rented at the market price." At the April 23d meeting it was voted to advise certain parties who had not subscribed for stock entitling them to "a lease of the land formerly occupied by them" to remove any building or property

from the premises as the company would lease them to others. At the first annual meeting of the stockholders, held June 25th, 1932, the plaintiff failed to be re-elected a director.

On or about April 1st, 1932, the Beach heirs gave the company a lease of all the land they had formerly leased to Averill for the balance of the term to March 1st, 1967, and the company in turn gave a lease to each of the occupants of lots formerly leased under the Beach-Averill leases upon which they had their dwellings and improvements, including a lease to Etzel & Sons of the two lots here involved reserving an annual rental of $25 for each lot, also including a lease to the plaintiff of the five lots which he occupied, reserving an annual rent, and the company agreed with him as to how the rent should be allocated to the five lots, and that until he parted with his leasehold or improved the lots, he should pay a smaller sum than that reserved in the lease. These several lessees accepted their leases and have since occupied under them. The plaintiff did not ask the company for a lease of the thirty-six lots for which he had received payment in full of rental to the end of the term, or take any steps to protect the interest of those leaseholders, but subsequently he made demand upon the defendants for recognition of an interest in him in the lots leased to Etzel & Sons, which the defendants refused, and he brought this action.

Specifically his principal claim was that he has rights under his original lease from Averill and his sublease to Etzel & Sons which entitle him to receive the difference between the annual rental of $25 per lot reserved in the latter lease and in the new lease by the company to the Etzels, and an annual rental of 1¾ per cent. of the assessed value of the two lots—the percentage applicable, under the corporation plan, to paid-up leases

—amounting to about $9 per year. This he claimed should be accomplished through a lease from the company to him at that rental subject to such rights as Etzel & Sons may have under its lease from him. The trial court concluded that the plaintiff has no such interest, and no interest, legal or equitable, in the two lots, and entered a declaratory judgment accordingly.

The decisive issue on this appeal, as it was on the trial, is whether, upon the facts found as herein stated, the company was under a duty or obligation to effectuate any reversionary interest of the plaintiff under the lease from Averill and that of the plaintiff to Etzel & Sons. Determination of it depends ultimately upon the soundness of the final conclusion reached by the trial court that the corporation undertook no trust obligation "toward any alleged reversionary, mortgagee, or other interest in the land, or any duty toward anyone except to obtain for the former leaseholders in occupation of lots at the time of the termination of the Beach-Averill lease, a new lease of their lots on the most favorable terms." The situation with which the parties were confronted and which led to the formation of the corporation, the proceedings preliminary to and attending the incorporation, the practical construction placed by all concerned upon the scope of the purposes of the corporation, and all of the other relevant circumstances point significantly to a plan and purpose limited to securing new leases for lessees in possession and occupation of lots. The judgment in the summary process action terminated the Beach-Averill lease, and, as the unquestioned finding states, terminated all subleases and assignments and other interests based upon or acquired under it, and with the giving of the lease to the company amounted to a re-entry and eviction of all tenants thereunder. 1 Underhill, Landlord & Tenant, p. 631; *Kovner* v. *Dubin,* 104

Conn. 112, 118, 132 Atl. 473; *Read* v. *Tuttle,* 35 Conn. 25; *Guffy* v. *Hukill,* 34 W. Va. 49, 55, 11 S. E. 457; *Baxter* v. *Heimann,* 134 Mo. App. 260, 264, 113 S. W. 1152.

The finding discloses that there were ninety-four original lessees under Averill, forty-nine only of whom were known to be living, thirty-one were known to be dead, and fourteen had removed from Branford. Sixty-two of the lots had been divided and subdivided several times over, with deaths and removals in the chain of title, all of which would render it impossible, or at least impracticable, to have recognized all interests prior to the immediate occupants of the land at the time of the termination of the Beach-Averill lease. Obviously this was the main consideration which militated against plan (2) mentioned by the committee— the taking of an assignment of the Averill leases— which, it was stated, would mean taking them subject to all accrued incumbrances and complications, many of which could not be ascertained, and led to the recommendation that this method be not attempted. Plan (3), which was recommended and was adopted and pursued, contemplated plainly enough termination of all interests under the Averill leases and the securing of new leases for those then in possession and occupancy of lots and whose dwellings and other improvements were in jeopardy. The finding already quoted as to the purpose for which the corporation was formed is consonant only with such an intent. It was indicated in the invitation to subscribe for the stock that the allotments of shares were based upon and followed plan (3) that each present leaseholder subscribe for substantially as many shares "as the assessed value of his present leased land . . . bears to the sum of all the assessments."

The plaintiff subscribed for the allotment based on

his five retained lots, and made no offer to subscribe for additional shares based upon the two Etzel lots, or upon any of the thirty-six others of which he was a sublessor and for which he had been paid rental in full to 1967. He participated in directors' meetings at which votes were passed indicating that stock subscriptions and the leases to be given were confined to occupants of lots. In common with all the other tenants in possession, by accepting a new lease from the company he in effect surrendered possession under the former leases, acquiesced in and recognized the lease from the Beach heirs to the company and the new leases from the company to present occupants, and accepted possession under such a new lease. Apparently it was not until some time later, and after leases had been given by the company to all of the occupants of lots upon which they had dwellings and improvements, including Etzel & Sons, that the plaintiff first advanced a claim for recognition and protection of his reversionary interests in the earlier Etzel lease. The record supports the finding that "In all the proceedings as shown by the exhibits there is no mention of reversionary or mortgage interests or any other interest than that of the old leaseholders." On the whole we are amply satisfied of the correctness of the trial court's conclusion that the company was under no trust or other obligation or duty to the plaintiff with reference to any reversionary interests in the lots here involved, and of the judgment that he has no present interest in them.

There is no error.

In this opinion the other judges concurred.